Gordon MAURER, Louis Trapane, Walter Anderson, John Horek, Marvin Keefer, William A. Sitler, next of kin and Executor of the Estate of Paul W. Sitler, Louis Chea, Rudolph Felix, Joseph Koval and Michael Cicini

v.

INTERNATIONAL UNION UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Strick Corporation, and Local 644, United Automobile, Aerospace and Agricultural Implement Workers of America.

Civ. No. 76–699.

United States District Court, M. D. Pennsylvania.

June 13, 1979.

Peter B. Broida, Washington, D. C., Winkler, Dannoff & Lubin, Wilkes Barre, Pa., for plaintiffs.

Martin Wald, Paul R. Lewis, Philadelphia, Pa., George A. Spohrer, Wilkes Barre, Pa., Richard H. Markowitz, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Presently before the court are cross-motions for summary judgment filed on behalf of plaintiffs and two of the defendants, the International Union and Local 644 of the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). The third defendant, Strick Corporation, opposes plaintiffs' motion for summary judgment and has requested that judgment be entered in its favor. Plaintiffs are 11 persons formerly employed by Strick in Berwick, Pa.[1] During their period of employment, which ended in 1974, plaintiffs were represented by Local 644 and the International. Many of the plaintiffs were active as officers in the Berwick unit of Local 644, one of 15 separate units in the Local and the unit operating in Strick's Berwick, Pa. plant.[2]

Plaintiffs have brought this action pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, contending that the failure of Strick to rehire them in

---

1. While this action was pending, one person died and has been replaced by the executor of his estate.

2. Each unit is autonomous for a variety of purposes, including contract negotiations.

accordance with the terms of an arbitration award is a result of a breach of the duty of fair representation by the International and the Local. A secondary contention is that Local 644 has violated 29 U.S.C. § 411(a)(1) and (2) by denying plaintiffs certain rights of equal participation with other members in the business of the union. After this action was instituted, four of the plaintiffs filed unfair labor practice charges against defendants with the National Labor Relations Board (NLRB).

The motions for summary judgment initially became ripe in late 1977. While the motions were under consideration, the Office of the General Counsel of the National Labor Relations Board ordered that there be a hearing before an administrative law judge to consider the related unfair labor practice charges.[3] Oral argument on the motions was held by this court on July 7, 1978. The final post-argument brief was filed August 7, 1978, although counsel has continued to keep the court apprised of recent decisions and other developments, especially with respect to the question of exhaustion of intraunion remedies. On November 16, 1978, Administrative Law Judge Joel A. Harmatz rendered a decision in the NLRB proceeding in which he concluded that neither the unions nor the Strick Corporation committed unfair labor practices. On March 19, 1979, an NLRB panel af-firmed this finding of the administrative law judge, adopted his November 16, 1978, decision and dismissed the unfair labor practice charges.[4]

Partial summary adjudication will be ordered for the defendants on the § 411 claim, and plaintiffs will be granted partial summary adjudication on the threshold issue of whether the duty of fair representation claim will be dismissed because of the failure to exhaust intraunion remedies. However, because of the existence in the record of certain material issues of fact necessary to decide the merits of whether there has been a breach of fair representation, there will be no entry of summary judgment on this claim.[5] And further, because I am persuaded that resort to intraunion remedies may be available now as a means of resolving this dispute, I will stay these proceedings for a three-month period to allow the present efficacy of UAW remedies to be tested. The factual recitation that follows will be limited primarily to matters about which there is no material dispute and on which partial summary adjudication will be granted and also to those matters pertinent to the stay. Disputed issues of fact pertinent to one of the remaining issues of whether there has been a breach of the duty of fair representation will be identified, but will not be discussed in detail.[6]

3. The court then requested representations by the parties as to whether a decision on the motions should be temporarily withheld pending the NLRB action. All parties agreed that the court should not withhold a decision. Indeed, Strick had argued before the NLRB that it should defer to the civil action here. See Brief of Strick Corporation Before the NLRB at 13–16 (Doc. # 133, Aug. 7, 1978).

4. While counsel for the unions has advanced the contention that the determination by the NLRB is res judicata here, this contention was not originally advanced in the union's motion for summary judgment and has not been thoroughly briefed by the parties. It is important to resolve the contentions that have been raised and thoroughly argued, leaving to some future time questions relating to the doctrine of res judicata.

5. The record before the court consists of the discovery undertaken by the parties in this action as well as three days of testimony taken by the NLRB administrative law judge on May 15 through May 17, 1978. See Oral Argument Exhibit # 1 (Doc. # 128, July 7, 1978). The factual record is argued by the parties in correspondence and 13 legal memorandums. While the parties have expended considerable time, expense, and energy in compiling a record that is extensive, considering the nature of the case and the fact that it is still in a pretrial stage, the simple fact remains that there are two views, one advanced by plaintiffs and the other, by defendants, of the union's motivation in agreeing to Strick's proposal to eliminate the arbitration award. See note 15 et seq. infra and accompanying text. Since both views find some support in the record, resolution of this conflict must await trial or other resolution of this dispute.

6. While not yet crucial to this litigation, the court notes the existence of certain news reports of further labor difficulties at the Berwick plant and of plans to close the plant by Strick.

## FACTUAL BACKGROUND

On September 19, 1972, Strick and Local 644 signed a three-year collective bargaining agreement. The employees in the Berwick unit, all members of the union, numbered about 200. Within the next year and one-half, three "wildcat" strikes occurred following disputes over a variety of matters. On July 10, 1974, 12 employees from an evening shift left work to attend a union meeting. While they attended the meeting, the General Foreman ordered them discharged for unauthorized absence from their shift. None of the 12 employees is a plaintiff here. On the next day, July 11, attempts were made to settle the matter. Reinstatement was offered, but the 12 discharged nightshift workers insisted on reinstatement with backpay. On July 12, 1974, a Friday, the 12 organized a picket line around the Berwick plant. By the end of the day, most of the employees, including plaintiffs, had joined the walkout. During the following workweek (July 15 to July 19, 1974), whether as a result of choice or coercion by picketing employees, plaintiffs and the other employees honored the picket lines and the plant was shut down. Representatives of Strick, the International, and the Local made efforts to resolve the dispute, but were unsuccessful. Strick obtained a state court injunction against the picketing and warned the "wildcatting" employees that they could be discharged if they did not return to work. During the week when the plant was to be shut down for a summer vacation (July 22 to July 26, 1974), the striking employees, including plaintiffs, were discharged.

Strick began hiring replacement workers. These newly hired employees crossed the picket lines of the discharged strikers. Ultimately, about 100 new employees were hired, and after their probationary periods were completed, all joined the Berwick unit of Local 644. At the same time the Local pursued a grievance on behalf of the discharged employees. The grievance was processed through arbitration. Prior to the arbitrator's decision, Strick also rehired a few of the discharged workers.

The arbitration hearing was held November 1, 1974. At the hearing the union argued for reinstatement with full backpay for all the discharged workers. Strick contended that the discharges were proper under company rules and the collective bargaining agreement. The decision of the arbitrator was rendered November 27, 1974. The arbitrator upheld the discharge of the employees, concluding that Strick did not violate the collective bargaining agreement by discharging the striking employees or by rehiring replacement workers. However, he stated that a loss of employment and acquired seniority was too harsh a penalty, especially for those with a lesser involvement in the wildcat strike. Consequently, the arbitrator ordered that a re-employment roster be established, that vacancies, as they occurred, would be filled from the roster, and that those rehired from the re-employment roster would regain their old seniority.

At the top of the roster would be placed in order of seniority all employees who worked a full shift on July 12, 1974, the first day of the work stoppage, along with those on authorized leave. Those who did not so qualify (including, for example, the initial picketing employees and those who joined them during working hours of the first day of the strike) would be placed at the bottom of the re-employment roster. The deadline for signing up for the roster was January 15, 1975. All the plaintiffs and about 100 of their fellow discharged employees signed a recall roster from which the re-employment roster would be prepared. However, after the arbitration award and through all of 1975, Strick rehired only one former employee.

Following the arbitration decision, plaintiffs took no formal steps to maintain their memberships in the Local and International; neither was any formal action taken by the unions to discontinue their memberships. According to the record, the plaintiffs were never informed as to how to

continue their memberships.[7] At least one other plaintiff was told that the membership would continue automatically, but only until the arbitrator's decision was rendered.[8] The International Representative recalled in his deposition that plaintiffs' memberships terminated when they failed to take certain affirmative steps (discussed infra) as required by the International's constitution.[9]

These conflicting opinions and conclusions aside, the factual question of whether "membership" under the rules of the union continued can be determined by reference to the existing record. It was the ordinary practice of the Local to maintain laid-off employees as union members, and similarly to maintain as members former employees whose discharges were being contested by grievance or arbitration if a member from either group had some prospect of re-employment.[10] Even assuming plaintiffs, with their expectation of re-employment under the arbitration award, were in an analogous position, their good standing in the union would, however, continue only if they paid dues or were excused from doing so. Excuse from the dues requirement was governed by Article 16, section 19 of the union constitution, which mandated monthly reporting to the Financial Secretary of the Local.[11] Since it is undisputed that plain-

tiffs neither paid dues nor reported to the financial secretary,[12] plaintiffs were not "members" of the union.[13]

Although the new members of the Berwick unit did not initially participate in the affairs of the union, activities in the other units of the Local and in the Local itself continued and once the arbitrator's decision was rendered, officials of the Local took steps to organize the new members of the Berwick unit. In late 1974 or early 1975, new officers of the unit were elected; only the new employees participated in the election. With the contract between the UAW and Strick due to expire on September 18, 1975, a negotiating committee was created in June 1975, composed of Local and International representatives and members of the Berwick unit. In July 1975, at the first negotiating session, Strick made a proposal that would later become section 21.01 of the new contract. Strick proposed elimination of the arbitration award by providing that the new contract would "supersede and cancel all previous agreements and/or arbitration awards."

The parties agree that Strick pressed this proposal through all stages of the negotiations. The representatives of the International and Local were reluctant to consider the matter and consulted with their attor-

---

7. *See* Affidavits Submitted in Support of Plaintiff's Summary Judgment Motion (Doc. # 109, Sept. 6, 1977). The affidavits indicate merely that no union official ever informed the old employees as to how to maintain membership, or that they were informed by union officials that there was no necessity to pay dues. The statements recounted by plaintiffs in these affidavits are relevant and material on the question of notice to the plaintiffs or on the issue of whether defendants are estopped from denying union membership, but constitute hearsay with regard to the truth of the matter asserted, i. e., whether "membership" under the union constitution did, in fact, automatically continue.

8. *See* Oral Argument Exhibit # 1, at 119 (Doc. # 128, July 7, 1978) (Notes of Testimony before NLRB Administrative Law Judge).

9. *See* Deposition of Paul Clouser, at 47–48 (Doc. # 70, April 25, 1977).

10. *See* Deposition of Joseph R. Connor, at 50–53 (Doc. # 69, April 25, 1978).

11. *See* Exhibit # 1 to the Affidavit of William J. Beckham (Doc. # 84, June 14, 1977).

12. *See* Affidavit of Donald Grubb (Doc. # 15, Oct. 3, 1977).

13. Plaintiffs have argued that they were never notified of any dues delinquency. Under the union constitution, dues were not the sine qua non of union membership, since reporting to the Financial Secretary was an available alternative. Moreover, plaintiffs have pointed to no provision of the constitution or bylaws of the union establishing procedures for termination after notice to a member not in good standing. Rather, maintenance of good standing required affirmative steps by the member. It is also worth noting that some of the plaintiffs were officers in the Berwick unit, who could be expected to know that their status would be governed by the constitution and bylaws.

neys in an effort to ascertain the legality of the proposal. Apparently, the unit officers and representatives on the negotiating committee (who, of course, were all new employees) took no particular position on this question during the negotiations. Ultimately, the negotiating committee accepted the proposal and, at the ratification meeting on the evening of September 18, 1975, the new contract, with section 21.01, was discussed. While there had been some awareness on the part of the new employees that the arbitration award had created some right of re-employment for the discharged workers, the ratification meeting was the first occasion that the arbitration award was explained to the new employees as a group. Only the new employees in the unit were present at the ratification meeting; the discharged workers, including plaintiffs, were not notified of the contract negotiations and ratification meetings and took no steps themselves to participate in the contract negotiations.[14] At the meeting the operation of section 21.01 was explained to the new members; the contract with section 21.01 was adopted. While these facts are undisputed, the parties disagree on what motivated the Local and International representatives in accepting the proposal and, along with the unit officers, presenting the contract to the membership for ratification.

Plaintiffs contend, with some support in the record, that the International and Local representatives were motivated by consideration for the new members of the Berwick unit and that the interest of the discharged employees in being rehired in accordance with the arbitration award was arbitrarily sacrificed in favor of the interests of the new employees.[15] It is plaintiffs' position that the union was motivated by the self-serving interests of the new employees, who desired adoption of section 21.01 in order to gain greater job security (the arbitration award provided for recovery of old seniority by the former employees upon rehiring), to lessen the workload of the present workforce (some new employees thought that Strick was refraining from doing any hiring while the arbitration award was in effect) and to gain greater economic concessions during bargaining (the 21.01 proposal was a matter of great concern to Strick in exchange for which Strick would presumably make other concessions). Plaintiffs also argue, again with some support in the record, that at least some employees undertook in early 1975, albeit with limited success, a decertification effort which caused the Local and International union some concern that it would lose the Berwick unit.

The Local and International contend, relying on other matters in the record, that Strick had made the proposal a "strike issue" and that the choice the union had was between forcing a strike, without much likelihood that the strike would be supported by the new members, or accepting the company's proposal. Strick, the union argues, had strong motivations for pressing the 21.01 proposal; (1) disagreement with correctness of the arbitration award itself; (2) concern that the old employees would generate new wildcat strikes if they returned; (3) awareness of the ill will between the discharged employees and the new group, many of whom had to cross picket lines; and (4) fear that the return of the discharged employees would disrupt production at the plant. For whatever reason, representatives of the Local and International, along with unit officers, presented the contract with section 21.01 to the membership of the Berwick unit and, on September 18, 1975, at the ratification meeting, the contract was adopted.

---

14. The exclusion of plaintiffs from the negotiating process could be contested by plaintiffs through the use of intraunion remedies, assuming the plaintiffs are able to invoke the union appeals processes. It is undisputed that plaintiffs were not aware that abrogation of the arbitration award was being considered until several months after the adoption of section 21.01.

15. Plaintiffs rely, not on any concise statement of the reasons for this action made in a deposition or during the NLRB hearing but rather, upon the general circumstances surrounding contract negotiation and adoption as explicated in depositions and hearing testimony.

In January 1976, Strick began hiring new employees without the use of either the recall or re-employment rosters.[16] That same month one of plaintiffs heard of the hiring, began inquiry into the matter, and retained counsel. This action was filed on June 2, 1976, seeking enforcement of the arbitration award. In the answers of defendants in this litigation, plaintiffs were first informed of the existence of section 21.01 and the abrogation of the arbitration award.[17]

While discovery was being conducted by the parties, four of the plaintiffs filed charges of unfair labor practices with the NLRB. In June 1977, the charging parties were informed that a complaint would not be issued, but in December 1977, this decision was reversed and the proceedings remanded to the Regional Director for a hearing before an Administrative Law Judge. The hearing was held May 15 to May 17, 1978. On November 16, 1978, as hereinbefore noted, Administrative Law Judge Joel A. Harmatz rendered a decision on the unfair labor practices complaint, dismissing the charges against both Strick Corporation and the union. A panel of the NLRB affirmed this decision on March 19, 1979, and adopted the decision of the administrative law judge.

## "MEMBERSHIP" IN THE UNION FOR THE PURPOSES OF § 411

[1] Plaintiffs, in count II of the second amended complaint, allege a violation of 29 U.S.C. § 411(a)(1) & (2). Section 411 grants to *members* of labor organizations rights to participate equally with other *members* in the business of the union, *e. g.*, "to attend membership meetings, and to participate in the deliberations and voting . . . ." Thus, if the old employees were members of the union when the new contract and sec-

tion 21.01 were being considered, they had a right to participate equally with the new employees in the consideration and ratification of the contract. As counsel for the plaintiffs correctly observes, union membership is crucial to count II. Since there is no dispute of material fact with regard to the question of whether the old employees were "members" of the union, the defendants must be granted summary judgment on count II of the second amended complaint.

At issue here is only the question of whether the plaintiffs were, when the new contract was being considered, members of the union for the purposes of § 411; the plain language of § 411 imposes upon unions the obligations of providing notice and the opportunity to participate only to its members. As previously pointed out, however, there was no compliance with the applicable procedures on the part of the old employees after their discharge was affirmed by the arbitrator, and, therefore, their memberships in the union were not maintained. The parties have cited the court to no cases directly on point.

The case of *Confederated Independent Unions v. Rockwell-Standard Co.*, 465 F.2d 1137, 1140 (3d Cir. 1972), stands only for the proposition that § 411 does not require the submission of proposed contracts to the membership; however, when there is a union meeting, § 411 would nevertheless seem to require that the opportunity to participate in the proceedings be given, at least to members. The case of *Goodin v. Clinchfield Railroad Co.*, 125 F.Supp. 441 (E.D.Tenn. 1954), *aff'd* 229 F.2d 578 (6th Cir.), cert. denied, 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476 (1956), is somewhat closer. There, one union member and several non-members knew of a union meeting at which there would be a continuing discussion of a par-

---

16. Some 40 or 50 new employees were hired in early 1976. While all of plaintiffs signed the recall roster, the re-employment roster, to be set up in accordance with the arbitrator's decision, was apparently never actually established and it remains an open question as to whether all of the plaintiffs would have been re-employed had the arbitration decision not been abrogated.

17. There is a suggestion in the record before the NLRB that prior counsel, acting on behalf of one of the plaintiffs here, was notified in February 1976, prior to this action, of the existence of section 21.01. *See* note 18 *infra.*

ticular issue. They objected to the failure of the union to invite them to the meeting. While a claim under § 411 was not directly presented, the court concluded that this failure did not invalidate the agreement ultimately ratified.

■ At oral argument, counsel for the plaintiffs contended that the unions should be estopped equitably from denying plaintiffs' union membership. The facts of this case do not suggest an equitable estoppel. The statements made by the union officers in question rose from their own confusion as to the operation of the union constitution and membership provisions. An estoppel does not arise where both parties are ignorant of the truth; the statement upon which an estoppel may be based must have been made with a fraudulent purpose. Neither have plaintiffs established gross or culpable negligence on the part of these union officials, see *Hertz Corp. v. Hardy*, 197 Pa. Super. 466, 178 A.2d 833 (1962), but rather merely a mutual mistake of law or fact. See *Ham v. Gouge*, 214 Pa.Super. 423, 257 A.2d 650 (1969).

In accordance with the plain language of the statute, no claim under § 411 can be made where the persons involved were not at that time union members. The defendants will be granted partial summary adjudication on count II of the second amended complaint.

## EXHAUSTION OF INTRAUNION REMEDIES IN RELATION TO DISMISSAL OR STAY OF THIS ACTION

[4] The defendants have urged as a ground for the granting of summary judgment and dismissal of the remaining count I of the second amended complaint, the acknowledged failure on the part of the plaintiffs to exhaust intraunion appeals procedures. No question is presented with respect to the remedy of grievances through the exhaustion of procedures available by contract: the plaintiffs, along with other former employees and assisted by the union, grieved their discharge to arbitration, where the arbitrator granted the plaintiffs some conditional interest in being rehired. Rather, the question of exhaustion as argued by the defendants is presented in two other contexts: it is defendants' contention that the plaintiffs should have appealed the exclusion of the old employees from the process of negotiating and ratifying the contract with section 21.01 by using intraunion appeal procedures and, secondly, should have appealed the failure, allegedly apparent to the plaintiffs in January or February of 1976, to enforce the arbitration award granting the conditional interest in being rehired.

The exclusion from the process of negotiating and ratifying the new contract occurred in the period July through September 18, 1975, and the seeming failure to enforce the arbitration award occurred in January 1976. Neither of these events was apparent to the plaintiffs until early or mid-1976, a minimum of three or four months after the signing of the new contract with section 21.01 included.[18] Thus, it was not until several months after the events in question occurred that the plaintiffs were alerted to an apparent discrepancy between their understanding of the effect of the arbitration award on the one hand and the actions of Strick in resuming hiring without reference to the re-employment roster on the other.

In the circumstances here, the failure of the plaintiffs to resort to intraunion remedies is not an appropriate basis for the dismissal of their claim that the union

---

18. While the matter is not free from doubt, plaintiffs as a group appear to have had no knowledge that the arbitration award had in fact been abrogated by section 21.01 until the summer of 1976, after the filing of this action and during discovery. *See* note 17 *supra*. While prior counsel for one of the plaintiffs may have been informed in early 1976 of the existence of section 21.01, the content of the original complaint strongly suggests that the knowledge of the existence of section 21.01 was not available to the plaintiffs until after the action was filed. It is defendants' burden to establish all the operable facts demonstrating exhaustion but in any event it is not crucial to my decision regarding exhaustion as to whether knowledge of section 21.01 was gained in early 1976 or midyear.

breached its duty of fair representation. First and foremost, unlike most other cases in which exhaustion is invoked as a basis for dismissal, prior to the filing of this suit the plaintiffs were not cognizant of the operative facts upon which an intraunion appeal could be made. Secondly, the dispute here did not concern wholly internal union matters. Finally, dismissal will not be ordered because it would have appeared to the plaintiffs prior to the filing of this suit that resort to intraunion procedures would not have been timely.

The Court of Appeals for the Third Circuit in *Brady v. Trans World Air Lines, Inc.*, 401 F.2d 87 (1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 681, 21 L.Ed.2d 691 (1969), concluded that where a dispute focuses on the employment relationship, rather than a union member's relationship with the union, the doctrine of exhaustion is inapplicable and suit may be brought against a union without exhaustion.

> [T]he case involves the legality of Mr. Brady's discharge from his employment and not the legality of the IAM's dues increase. The [exhaustion] doctrine, relied on by IAM, applies to situations unlike the present one, which concern wholly internal union matters. The present dispute focuses on the employment relationship rather than the union relationship.

*Id.* at 102. Since the time for reinstatement in *Brady* had passed when the dispute with the union arose and became known to the plaintiffs, exhaustion was not required.

In addition, of course, the intraunion remedy must be available according to its terms. In *Bradley v. Local 119*, 236 F.Supp. 724 (E.D.Pa.1964), exhaustion was not required because the intraunion remedies were unavailable to persons deemed "non-members" under the particular grievance procedure involved. As in *Bradley*, where the remedy by its terms is restricted, a case should not be dismissed for the failure to resort to such a remedy. The grievance procedure promulgated by the International Union in this case does not by its own terms restrict the availability of that machinery to its "members," and it can be assumed for our purposes here that plaintiffs would have been able to resort to those procedures notwithstanding that they were not technically "members" under the union constitution and intraunion remedies were in that sense "available." However, the procedures in articles 33 and 34 of the International Union's constitution set forth specific time limits within which resort to the grievance procedure must be made. These periods vary from 30 to 45 days.[19] While the exclusion from the process of negotiating and ratifying the new contract is the kind of act for which the intraunion grievance machinery theoretically exists, the exclusion here predated by more than three or four months the plaintiffs' earliest possible knowledge of the events in question. By the time this knowledge was gained, there were no longer any negotiations under way, and the contract had already been ratified. At that point in time, the focus of the dispute had shifted to the employment relationship. The plaintiffs had no knowledge of the exclusion in question during the period of time when resort to the intraunion remedies was available. Resort to those remedies would have appeared to have been futile. *See Dorn v. Meyers Parking System*, 395 F.Supp. 779 (E.D.Pa.1975).

Inasmuch as the time for filing the grievance with the union had passed, the plaintiffs cannot be faulted for filing their complaint directly with this court. A permissible excuse for the failure to resort to intraunion remedies to contest the exclusion from the negotiating and ratification process has been shown. With regard to the question of whether the plaintiffs should have sought an intraunion appeal after the ratification of the new contract containing section 21.01, dismissal is similarly not justified. *See Goclowski v. Penn Central Transp. Co.*, 571 F.2d 747 (3d Cir. 1977); *Gainey v. Brotherhood of Railway and Steamship Clerks*, 275 F.2d 342 (3d Cir.), *cert. denied*, 363 U.S. 811, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); *Allsbrook v. Consoli-*

---

**19.** *See* exhibit No. 1 to the Affidavit of William J. Beckman (Doc. No. 84, June 14, 1977).

*dated Freightways*, 96 L.R.R.M. 2628 (E.D. Pa.1977). *See also Aldridge v. Ludwig-Honold Mfg. Co.,* 385 F.Supp. 695 (E.D.Pa. 1974), aff'd mem., 517 F.2d 1397 (3d Cir.), cert. denied, 423 U.S. 937, 96 S.Ct. 298, 46 L.Ed.2d 270 (1975).

While the circumstances here do not justify .dismissal of this action and plaintiffs' remaining claim in count I, I do believe that it is both proper and desirable for the court to stay these proceedings sua sponte for a relatively short period of time to permit the plaintiffs to test the present availability and efficacy of UAW intraunion remedies. My reasons for invoking this stay are several fold; the doctrine of exhaustion as amply demonstrated by a great number of cases, is exceedingly strong and well established. *See Aldridge; Gainey. See, e. g., Pawlak v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 444 F.Supp. 807 (M.D.Pa.1977), aff'd, 571 F.2d 572 (3d Cir. 1978). With the possible exception of the element of punishment, which I have found to be inappropriate given the circumstances of this case, the purposes behind the doctrine of exhaustion are fully served by this stay; if the plaintiffs are successful in their intraunion appeal, the necessity for further resort to the courts may be eliminated.

Another factor in my decision to stay these proceedings is the apparent efficacy of the intraunion remedies provided here by the UAW constitution, bylaws, and procedures. These remedies have received complimentary recognition in the courts. *See Newgent v. Modine Mfg. Co.*, 495 F.2d 919, 927 (7th Cir. 1974); *Bradley v. Ford Motor Co.*, 417 F.Supp. 23 (N.D.Ill.1975); *Fleming v. Chrysler Corp.*, 416 F.Supp. 1258 (E.D. Mich.1975); *Clayton v. ITT Gilfillan*, 96 L.R.R.M. 2558, 2560 (C.D.Cal.1977); *Bristow v. Fiat Allis Constr. Machinery, Inc.*, No. 77 C. 3098 (N.D.Ill., Dec. 19, 1978). Finally, although advanced in support of the unions' contention that the fair representation claim should be dismissed, Attorney Markowitz expressly and directly represented to the court that the International Union would consider any intraunion appeal filed by these plaintiffs without regard to their untimeliness under the union constitution. This representation was made at oral argument on July 7, 1978.

Because I am convinced that a stay advances both the purposes of the parties as well as the concerns embodied in the doctrine of exhaustion, a stay of three months will be ordered. The court has the inherent authority to direct that there be such a stay. *See Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936); *Pet Milk Co. v. Ritter*, 323 F.2d 586, 588 (10th Cir. 1963); 9 F. Poore and E. Coeber, Cyclopedia of Federal Procedure § 28.02 (1967). The plaintiffs will be given fifteen days within which to prepare and file their appeal. Perhaps some of the early steps can be eliminated by agreement of counsel. This stay will terminate upon the issuance of a final decision by the UAW or at the end of ninety days from the date of this order, whichever occurs first, and the court will schedule such proceedings in this matter thereafter as may be necessary.[20] The court will not order the submission of briefs on the question of collateral estoppel until after the expiration of this stay.

---

**20.** The court will entertain requests for reasonable extensions of time.